1  JACK P. DICANIO (State Bar No. 138782)
   Jack.DiCanio@probonolaw.com
2  ANIL J. ANTONY (State Bar No. 258839)
   Anil. Antony@probonolaw.com
3  WINSTON P. HSIAO (State Bar No. 273638)
   Winston.Hsiao@probonolaw.com
4  LOGAN D. WAYNE (State Bar No. 288227)
   Logan.Wayne@probonolaw.com
5  300 South Grand Avenue, Suite 3400
   Los Angeles, California 90071-3144
6  Telephone:   (213) 687-5000
   Facsimile:   (213) 687-5600
7
   Attorneys for Plaintiff
8  OAKS CHRISTIAN SCHOOL

**FILED**
CLERK, U.S. DISTRICT COURT

JUN 2 0 2013

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                  WESTERN DIVISION

12  OAKS CHRISTIAN SCHOOL, a          ) Case No. SACV13-0940 JST (JPRx)
    California nonprofit religious     )
13  corporation,                       ) CIVIL COMPLAINT for:
                                        )
14                                      ) (1) PETITION FOR WRIT OF
          Plaintiff,                    )     ADMINISTRATIVE MANDAMUS
15                                      )     (C.C.P. § 1094.5);
              v.                        ) (2) VIOLATION OF FIRST
16                                      )     AMENDMENT (42 U.S.C. § 1983);
    CALIFORNIA                          ) (3) VIOLATION OF CALIFORNIA
17  INTERSCHOLASTIC                     )     CONSTITUTION (ART. 1, § 4);
    FEDERATION SOUTHERN                 )
18  SECTION ("CIF-SS"), a               ) (4) DEPRIVATION OF EQUAL
    California nonprofit corporation;   )     PROTECTION (42 U.S.C. § 1983);
19  CALIFORNIA                          )
    INTERSCHOLASTIC                     ) (5) VIOLATION OF CALIFORNIA
20  FEDERATION ("CIF"), a               )     CONSTITUTION (ART. 1, § 7);
    California nonprofit corporation;   )
21  ROBERT L. WIGOD, in his             ) (6) DEPRIVATION OF RIGHT TO
    capacity as Commissioner and an     )     PROCEDURAL DUE PROCESS;
22  officer of CIF-SS;  DOES 1–23,      ) (7) BREACH OF CONTRACT;
    in their capacities as Executive    )
23  Committee members and               ) (8) BREACH OF IMPLIED
    directors of CIF-SS; and DOES       )     COVENANTS;
24  24–60, in their capacities as       )
    directors of CIF,                   ) (9) BREACH OF FIDUCIARY DUTIES;
25                                      )     and
26        Defendants.                   ) (10) VIOLATION OF CALIFORNIA
27                                      )      EDUCATION CODE § 33353(a).
                                        )
28                                      ) **JURY TRIAL DEMANDED**

                              CIVIL COMPLAINT

Pursuant to the Court's jurisdiction over this matter under 28 U.S.C. §§ 1331, 1343(a)(3)–(4), and 1367, Oaks Christian School ("Oaks Christian" or the "School"), for its Complaint (the "Complaint") alleges, upon personal knowledge with respect to itself and its own acts, and upon information and belief as to all other matters, as follows:

1.     This litigation is necessary to stop an attempt by the California Interscholastic Federation Southern Section ("CIF-SS" or the "Southern Section")— the state athletic association in southern California—to segregate religious, private schools from public schools on the state's athletic fields through abuse of process and with complete disregard for the education and wellbeing of students attending four Christian schools—Oaks Christian, Saint Bonaventure High School ("St. Bonaventure"), Damien High School ("Damien"), and St. Lucy's Priory High School ("St. Lucy's") (collectively, the "Religious High Schools").

2.     Instead of treating all schools equally and judging them by the same standards—as CIF-SS is required to do under the federal and state constitutions, as well by CIF-SS' internal rules contained in its own Constitution and Bylaws (the "Blue Book")—CIF-SS' Commissioner and members of its Executive Committee embarked on a plan to move these Religious High Schools away from the athletic leagues they have played in for as many as 50 years, with the intent to eventually place <u>all</u> the remaining Southern Section religious schools in athletic leagues far outside the geographic areas where the schools are located and where they currently play, forcing some students to choose between their education and playing high school sports.

3.     In doing so, CIF-SS ignored a fundamental tenet of its mission— ensuring that the educational opportunities of the students playing in its leagues are not compromised for political or administrative expediencies.  In particular, the California Interscholastic Federation ("CIF") Constitution, which binds CIF-SS, mandates that "everyone involved at any level of governance in the CIF" must work

1  to ensure that educational goals are not compromised and that the well-being of
2  student-athletes is always given the highest priority.

3      4.    Despite this clear guidance, and in order to facilitate their
4  unconstitutional plan, CIF-SS' Commissioner and members of the Executive
5  Committee, intentionally misapplied the process mandated by its Blue Book, which
6  requires CIF-SS to give primary weight to a high school's Area Placement request
7  because it is the best indication of what is in the best interests of the school,
8  including the education of its students.

9      5.    Far from prioritizing the schools' requests, as it was required to do, CIF-
10 SS flatly ignored the requests of the Religious High Schools and placed them in a
11 different Southern Section geographic Area—the Parochial Area—that is
12 geographically far from their campuses and student populations, for the 2014–2018
13 "leaguing cycle." (*See* Ex. 1 (Map of Northern, Parochial, and Mt. SAC Area
14 Schools).) All four schools now will have to make long trips across Los Angeles to
15 play opponents in Parochial Area leagues, which is something that no non-religious,
16 public school was required to do by CIF-SS. One school, in fact, will now travel a
17 minimum of 60 miles simply to reach its closest opponents in every sport except
18 football.

19     6.    CIF-SS' Commissioner and members of the Executive Committee
20 wholly ignored the Religious High Schools' welfare and the severe geographic-based
21 hardships caused by the CIF-SS' Area Placement decision, including the deleterious
22 consequences for student education and profound effect on the students' high school
23 experience. Students of the Religious High Schools face the prospect of collectively
24 missing tens of thousands of hours of classroom instruction time to accommodate the
25 longer travel times, and returning home significantly later from away games, which
26 will leave them with less time to study and rest.

27     7.    Given that CIF-SS has moved the Religious High Schools to leagues far
28 from their geographic bases, students who continue to play interscholastic sports will

also risk losing the opportunity to have their parents participate in and watch their "away" games.   Parent participation in athletics is an important and formative experience for children, and, for most of the parents, high school sports present the last opportunity for them to watch their children play competitive athletics.

8.    CIF-SS' decision to move the Religious High Schools to the Parochial Area comes at great financial cost to each of the schools, as well, as each school is expected to incur substantial transportation-related costs as a result of being moved to the Parochial Area.

9.    Finally, CIF-SS' decision also has similar effects on the schools already within the Parochial Area.  Like the Religious High Schools, these schools will face the consequences of being required to travel longer distances, including being forced to remove their students from classrooms earlier in the day to accommodate the longer drives to Oaks Christian, St. Bonaventure, Damien, and St. Lucy's.

10.    By targeting religious schools but not similarly-situated non-religious, public schools, CIF-SS has forsaken its obligation to act in the best interests of all students.  CIF-SS' Area Placement decision thus is offensive to the very principles of fair play and equity that CIF-SS claims to promote through high school athletics.

11.    Without the Court's intervention, including an injunction of CIF-SS' Area Placement decisions, Oaks Christian and the other Religious High Schools will suffer these and other significant hardships beginning in the 2014–2015 school year. Oaks Christian thus respectfully requests that the Court enjoin Defendants' unlawful actions.

## SUMMARY OF THE ACTION

12.    Founded in 2000, Oaks Christian School is a private, non-denominational Christian day school located in Westlake Village, California.  The school's Mission Statement is to "dedicate ourselves to Christ in the pursuit of academic excellence, artistic expression, and athletic distinction while growing in knowledge and wisdom through God's abundant grace."

13.     Oaks Christian prides itself on having a rigorous academic curriculum, which includes numerous honors-level and Advanced Placement classes.   The academic day is long, commencing at 7:55 AM and continuing until 3:15 PM.  Oaks Christian does not have an "athletic" period at the end of the school day, as many other schools do.

14.     As evidenced by the School's Mission Statement, high school athletics also play an important role in the lives and development of Oaks Christian's students. Indeed, one of the School's stated goals is for students to "[r]efine [their] bodies and character through teamwork and in competition that honors God . . . ."   Accordingly, the vast majority of Oaks Christian's roughly 940 students participate in interscholastic athletics.  Nearly 75% of Oaks Christian's students play a high school sport—approximately 81% of boys and 64% of girls.

15.     Since Oaks Christian's founding in 2000 and membership in the CIF-SS, the School has been placed in CIF-SS' Northern Area, which is one of nine geographical Areas comprising the Southern Section.   The other Areas in the Southern Section are the Orange County, Citrus Belt, Parochial, Mt. SAC, Coast, Foothill, Small Schools, and Desert Areas.  Each Area is subdivided into a number of athletic leagues.

16.     Oaks Christian is located within the geographic boundaries of the Northern Area, which is currently subdivided into six leagues.  Specifically, Oaks Christian plays within the Tri-County Athletic Association ("TCAA") for all high school sports except football, and the Marmonte League for football.  Oaks Christian is competitive within both leagues.

17.     Students enrolled in Oaks Christian primarily live within the geographic boundaries of the Northern Area.  They live in Ventura, Santa Barbara, and Los Angeles counties, with the majority of Oaks Christian's students living in Ventura County.  The vast majority of Oaks Christian's students—approximately 90%—live west of Topanga Canyon.

18.     The Northern Area is composed exclusively of schools—both public and private—located west of Topanga Canyon.  Oaks Christian's closest opponents to the north, south, east, and west are all in the Northern Area.  The average distance from Oaks Christian to its Marmonte League opponents—where Oaks Christian competes in football—is roughly 14 miles, and Oaks Christian is only one mile from its local rival, Westlake High School.  (*See* Ex. 2 (Map of Marmonte Football League).)  (Oaks Christian has, therefore, repeatedly asked to be "leagued" with the Marmonte League schools for <u>all</u> sports, including football, in the future.)

19.     For sports other than football, Oaks Christian currently plays TCAA schools, which are primarily located in Ventura County.  Although Oaks Christian, in general, travels farther to play opponents in the Tri-County Athletic Association than in the Marmonte League, there is minimal traffic west of Oaks Christian on U.S. Route 101, and thus the trips are usually not long.  For example, while the drive to St. Bonaventure—a current TCAA opponent—is roughly 30 miles, the trip rarely takes more than approximately 35 minutes.

20.     In the fall of 2012, despite Oaks Christian's physical location within the geographic bounds of the Northern Area and the Marmonte League, and Oaks Christian's clear desire to remain in the Northern Area, Defendant Robert L. Wigod, CIF-SS' Commissioner, proposed to CIF-SS' Executive Committee members that they move Oaks Christian to the Parochial Area, which entirely comprises schools within the geographic boundaries of Los Angeles County, east of Oaks Christian.

21.     Although any school—religious or non-religious, public or private—may be placed in the Parochial Area, CIF-SS' Parochial Area is exclusively composed of private high schools, virtually all of which are Catholic high schools.  Thirty-seven of the thirty-nine schools in the Parochial Area for the 2010–2014 leaguing cycle are religious high schools.  CIF-SS delegates certain administrative duties of the Parochial Area to the Catholic Athletic Association of the Archdiocese

of Los Angeles ("CAA"), although CIF-SS simultaneously retains jurisdiction over the Parochial Area.

22.     The Parochial Area is currently subdivided into six athletic leagues, all of which compete in a geographic area that is a considerable distance from Oaks Christian.  Oaks Christian's Parochial Area league opponents for the 2014–2018 leaguing cycle are, on average, <u>more than double the distance</u> from Oaks Christian than the schools in the nearest CIF-SS Northern Area league—the Marmonte League—where Oaks Christian currently plays football and where it would be competitive in all sports.

23.     To reach its Parochial Area opponents, Oaks Christian would have to travel an average distance of 28 miles, with several trips requiring Oaks Christian to travel more than 40 miles.  These lengthier distances, moreover, will be significantly exacerbated by the traffic on U.S. Route 101 and Interstate 405, two of the busiest highway corridors in the country, which Oaks Christian must navigate to reach <u>any</u> of its Parochial Area opponents.  A simple 30-mile trip toward Los Angeles through these highway corridors can often take an hour or more, and a 45-mile trip can take 1.5 hours or longer during rush hour.  In determining when to have its student-athletes leave their classes, Oaks Christian must plan for the contingency of heavy traffic, and thus would be required to withdraw its students from classes earlier in the day, causing them to lose classroom time.  Students would also return home later in the evening, leaving them less time to study and rest.

24.     Similar to Oaks Christian, the three other Religious High Schools also face substantially longer driving distances in their new Parochial Area leagues.  St. Bonaventure is a co-educational Catholic high school located in Ventura, California, which has been in the Northern Area for 50 years.  Like Oaks Christian, St. Bonaventure is a member of the TCAA for all sports except football, and a member of the Marmonte League for football.  St. Bonaventure is squarely within the geographic area of the TCAA and Northern Area, and is competitive with other high

1 schools within the TCAA and the Marmonte League. In contrast, in order for St.
2 Bonaventure to play in an appropriately competitive Parochial Area league, for all
3 sports except football it will have to travel 60 miles merely to reach its <u>closest</u>
4 opponent and must travel an <u>average of 76 miles one-way</u>. Currently, St.
5 Bonaventure is required to travel no more than 36 miles to reach <u>any</u> of its non-
6 football opponents.

7      25. Damien is a Catholic boys high school located in La Verne, California.
8 Damien has played in the Sierra League (within CIF-SS' Mt. SAC Area) and its
9 predecessor league for 30 years. Moreover, Damien is located in the geographic
10 middle of the Mt. SAC Area, and is competitive with schools in its league and the Mt.
11 SAC Area. While Damien's commute to opponents in its current league is roughly
12 10 miles, Damien's average drive to the schools in its 2014–2018 Parochial Area
13 league has <u>quadrupled</u>—to 40 miles one-way.

14      26. St. Lucy's is a Catholic girls high school located in Glendora, California.
15 Like Damien, St. Lucy's has played in the Sierra League and its predecessor league
16 for 30 years. St. Lucy's is also located within the geographic area of the Mt. SAC
17 Area, and is not within the geographic boundaries of the Parochial Area. St. Lucy's
18 is competitive with other high schools in the Mt. SAC Area and, specifically, the
19 Sierra League. In the new Parochial Area leagues, St. Lucy's average trip has <u>tripled</u>,
20 from 12 miles to 36 miles one-way.

21      27. In addition to the severe consequences for the education of students at
22 the Religious High Schools, each of these Religious High Schools will also face
23 significant financial repercussions as a result of CIF-SS' Area Placement decision.
24 Playing in the Parochial Area is, for example, expected to significantly increase Oaks
25 Christian's yearly transportation costs, because Oaks Christian will be required to
26 hire buses for the long trips, instead of relying on parents to drive the School's vans.
27 Moreover, the Area Placement decision will also have negative repercussions for
28

Oaks Christian's enrollment. CIF-SS' decision will affect the other Religious High Schools similarly.

28.    Oaks Christian and the other Religious High Schools cannot merely opt out of CIF-SS' leagues and play independently of CIF-SS' structure, however. First, a school must be a member of CIF to participate in the California State Championships in any sport. Second, CIF is effectively the only avenue for California high schools to compete in interscholastic athletic activities because virtually all high schools in southern California are members of CIF. CIF and CIF-SS' bylaws provide that CIF-SS may bar a member school from playing a school that is not a member of CIF. A non-member school may not play within CIF-SS' leagues, and a CIF-SS member may only play a non-member school with the permission of CIF-SS. A CIF member school failing to comply with this rule risks being barred from participating in CIF or CIF-SS competition for the following season.

29.    Although Wigod informed the Religious High Schools that he proposed moving the schools to the Parochial Area based on the Criteria for Area Placement ("Area Placement Criteria" or "Criteria") defined in CIF-SS' Blue Book, which contains the organization's Constitution and Bylaws, Wigod did not, in fact, neutrally apply the Criteria to determine where Oaks Christian and the other Religious High Schools fit best.

30.    Wigod, instead, proposed moving Oaks Christian and the other Religious High Schools to the Parochial Area to affect his and CIF-SS' agenda of segregating religious schools in the Parochial Area, where they would not play public schools in league games. At one meeting, Wigod told staff from St. Lucy's that he was moving these schools to the Parochial Area so that they could play "like schools"—i.e., CIF-SS believed that the Religious High Schools should be moved solely because they are faith-based, like the schools currently in the Parochial Area. Given the unsupported and constitutionally impermissible nature of his Area Placement recommendations, Wigod, unsurprisingly, did not—and, indeed, could

not—articulate a legitimate reason for moving Oaks Christian (or the other Religious High Schools) to the Parochial Area that comported with the Area Placement Criteria.

31.     Notably, CIF-SS did not single out any similarly-situated non-religious, public schools for similar treatment.

32.     Nevertheless, the Executive Committee—which, among other things, is responsible for voting on and approving Area Placement recommendations—rubber-stamped Wigod's decision.  This result is hardly surprising, given that 21 of the 23 purported members of CIF-SS' Executive Committee represent the interests of non-religious schools.   CIF-SS' Executive Committee is thus effectively devoid of members whose interests are aligned with students of religious schools, and is not representative of the actual complexion of the Southern Section, where more than 30% of the schools are religious schools.

33.     Oaks Christian and the other Religious High Schools subsequently appealed the Executive Committee's Area Placement decision.  However, although the California Education Code requires CIF and CIF-SS to provide a neutral panel to hear appeals of final decisions, such as this, CIF-SS required Oaks Christian and the other Religious High Schools to take their appeals before the _same_ Executive Committee that rubber-stamped Wigod's contested Area Placement decision.  It is thus unsurprising that Oaks Christian and the other Religious High Schools lost their appeals and were subsequently placed into Parochial Area leagues for the 2014–2018 leaguing cycle.

34.     Through the entire process, moreover, neither Wigod nor any member of the Executive Committee articulated a principled reason for moving Oaks Christian and the other Religious High Schools away from their current Southern Section Areas—where they all fit geographically and are competitive—and to the Parochial Area.

35.     The actions by Wigod and members of CIF-SS' Executive Committee violate, _inter alia_, the United States and California Constitutions, and breach the

1  contracts between CIF-SS and CIF, on the one hand, and Oaks Christian, on the

2  other.

3      36.    Accordingly, Oaks Christian seeks the Court's intervention to obtain

4  remedies for the Defendants' unlawful acts.  Among other things, Oaks Christian

5  seeks injunctive relief barring CIF-SS and CIF from enforcing the Area Placement

6  decision to move Oaks Christian away from the Southern Section's Northern Area

7  and to the Parochial Area.

8                        **JURISDICTION AND VENUE**

9      37.    This Court has federal question jurisdiction over this action pursuant to

10  28 U.S.C. §§ 1331 and 1343(a)(3)–(4).  This Court has supplemental jurisdiction

11  over Oaks Christian's state law claims pursuant to 28 U.S.C. § 1367.

12      38.    Venue is proper in this District pursuant to 28 U.S.C. § 1391, as all

13  defendants are residents of the state of California, and Defendants CIF-SS and

14  Wigod reside in this district.  Moreover, the events giving rise to the claims alleged

15  herein occurred in this district.

16                             **THE PARTIES**

17      39.    Oaks Christian School is a nonprofit religious corporation organized

18  and existing under the laws of California with its principal place of business in the

19  County of Los Angeles, California.  The School is a member of CIF and CIF-SS, to

20  which it pays annual membership fees.

21      40.    Defendant California Interscholastic Federation is a California nonprofit

22  corporation with its principal place of business in the County of Sacramento,

23  California.  CIF is a membership organization composed of member public and

24  private schools.  CIF is authorized under California Education Code § 33353 to serve

25  as the interscholastic athletic association for the State of California, and is governed

26  by the CIF Federated Council, which is responsible for establishing State CIF policy

27  and, *inter alia*, amending the CIF Constitution.  CIF consists of ten geographical

28  Sections, which are permitted by the CIF Constitution to "establish local rules and

1   regulations as long as they are no less stringent [than State policy] and do not violate

2   State policy rules or intent."  The CIF Constitution and Bylaws "are binding on all

3   schools, leagues, and sections," and require member schools to abide by the

4   Constitution and Bylaws.  CIF's rules also requires each member school to "[a]bide

5   by additional requirements [imposed by its particular] Section."

6       41.   Defendant California Interscholastic Federation Southern Section is a

7   California nonprofit corporation with its principal place of business in the County of

8   Orange, California. CIF-SS is a membership organization composed of member

9   public and private schools.  CIF-SS is a Section of CIF, and is thus the athletic

10  association for the Southern Section area. CIF-SS is governed by a Council ("CIF-

11  SS' Council") and an Executive Committee.  CIF-SS' Council is composed of

12  elected officers—a President, President-Elect, Past-President, Commissioner of

13  Athletics, and Treasurer—and elected representatives from the leagues within the

14  Southern Section.  CIF-SS' Council is the legislative body of CIF-SS, and is

15  responsible for making any changes to the Constitution, Bylaws, or rules of CIF-SS,

16  which are collectively contained within the Blue Book.  CIF-SS' Executive

17  Committee is, in turn, responsible for enforcing the rules and regulations approved

18  by CIF-SS' Council.  Pursuant to Article 7 of CIF-SS' Constitution, the Executive

19  Committee comprises (a) Officers—the CIF-SS President, President-Elect, Past-

20  President, and Treasurer; and (b) elected Regular Members—an Activities Director

21  Representative, nine Area Representatives, an At-Large Representative, a Boys'

22  Athletic Directors' Representative, a Girls' Athletic Directors' Representative, a

23  School Board Member Representative, and a Superintendents' Representative.

24      42.   Defendant Robert L. Wigod serves as the Commissioner, and an officer

25  and director, of CIF-SS.  In his capacity as Commissioner, Wigod has primary

26  responsibility for CIF-SS's Area Placements, including applying the Criteria for

27  Area Placement and making Area Placement recommendations to CIF-SS' Executive

28  Committee.

43.     Plaintiff does not know the true names and capacities of the defendants sued herein as Does 1 through 23, but alleges that these defendants are purported Officers and Executive Committee members, and other directors, of Defendant CIF-SS (collectively, "Executive Committee").  Plaintiff is informed and believes that each of these defendants designated as a Doe is legally responsible in some manner for the events and happenings referred to herein, and proximately caused the injuries alleged herein.  Plaintiff Oaks Christian will amend this complaint to allege the true names and capacities of these Doe defendants when they are ascertained.

44.     Plaintiff does not know the true names and capacities of the defendants sued herein as Does 24 through 60, but alleges that these defendants are the purported Executive Director, Officers, Executive Committee members, Federated Council members, and other directors of Defendant CIF (collectively, "CIF State Directors").  Plaintiff is informed and believes that each of these defendants designated as a Doe is legally responsible in some manner for the events and happenings referred to herein, and proximately caused the injuries alleged herein. Plaintiff Oaks Christian will amend this complaint to allege the true names and capacities of these Doe defendants when they are ascertained.

45.     Each of the defendants was the principal, agent, or employee of each of the remaining defendants, and in doing the things hereinafter alleged, each was acting within the course and scope of said agency or employment with the advance knowledge, acquiescence, or subsequent ratification of each and every remaining defendant.

## FACTUAL BACKGROUND

I.   **Commissioner Wigod and CIF-SS selectively targeted religious schools and, against the schools' requests, moved them to the Parochial Area without regard for student education and welfare**

46.     CIF-SS conducts an Area Placement process every four years as a precursor to realigning athletic leagues.  In or about September 2012, Wigod thus

distributed a form entitled "Area Placement – Releaguing" ("Area Placement form" or the "form") to the principals of schools in the Southern Section.   The Area Placement form required each school to indicate whether it would prefer to remain in its current geographic Area or move to a new Area within the Southern Section for the 2014–2018 leaguing cycle.   The form specifically indicated that schools which "fail[ed] to respond by October 15, 2012 will remain in their assigned/current area."

47.   If a school wished to remain in its current Area, it was merely required to check a box indicating its desire to remain in the Area.   If, on the other hand, a school wished to be moved to a new geographic Area, the school was required to check a different box <u>and</u> describe the reasons why it wanted to move to the new Area, based on the criteria of competitive equity, geography, and enrollment.   Only a school that wished to move to a new geographic Area was required to justify its request in writing.

48.   Rather than failing to respond to the Area Placement form—which, according to the Area Placement form, would apparently have guaranteed Oaks Christian's continued placement in the Northern Area—Oaks Christian followed CIF-SS's instructions and checked the box indicating that it wished to remain within its "current leagued area."

49.   Despite Oaks Christian's request, and the fact that the form contemplated that CIF-SS would not move a school against its wishes, on or about November 26, 2012, Wigod proposed moving Oaks Christian, as well as St. Bonaventure, Damien, St. Lucy's, and Pomona Catholic School to the Parochial Area.   St. Bonaventure, Damien, and St. Lucy's all also requested to remain within their respective Southern Section Areas—for St. Bonaventure, the Northern Area, like Oaks Christian; and for Damien and St. Lucy's, the Mt. SAC Area.

50.   CIF-SS' Blue Book contains rules—including a non-discrimination policy—that circumscribe CIF-SS from discriminating on the basis of, *inter alia*, religion in administering athletic programs.   Moreover, rules governing CIF-SS

1 | require it to ensure that students have equal opportunities regardless of their religion.
2 | CIF's Constitution and Bylaws contain similar rules.

3 | 51. Nevertheless, all of the schools that Wigod proposed moving to the
4 | Parochial Area were religious schools.

5 | 52. Wigod did not propose moving any non-religious, public schools to the
6 | Parochial Area, and, upon information and belief, Wigod did not consider moving
7 | any similarly-situated non-religious, public schools to the Parochial Area, including,
8 | without limitation, Malibu High School, Oak Park High School, Calabasas High
9 | School, Duarte High School, Bassett High School, Charter Oak High School, Azusa
10 | High School, Covina High School, and La Puente High School. Many of these
11 | schools are similarly sized to the Religious High Schools, are comparably close to
12 | the Parochial Area, and have certain competitive sports programs.

13 | 53. Moreover, Wigod did not propose moving any non-religious, private
14 | schools to the Parochial Area.

15 | **II. CIF-SS' Area Placement Criteria prioritize a school's Area Placement**
16 | **request because it is the best evidence of the welfare of the school**

17 | 54. CIF-SS' Blue Book, which includes CIF-SS' Constitution and Bylaws
18 | and incorporates CIF's Constitution and Bylaws, contains sections governing CIF-
19 | SS' Area Placement process and Area Placement Criteria. (*See* Ex. 3 (Excerpt of
20 | Blue Book).) CIF's Constitution and Bylaws are binding upon CIF, the Southern
21 | Section, and its member schools, while CIF-SS' Blue Book is binding upon it and its
22 | member schools, including Oaks Christian and the other Religious High Schools.

23 | 55. The Criteria, which govern CIF-SS' Area Placement and appeals
24 | processes, limit CIF-SS' consideration to (1) "[t]he initial request of the member
25 | school"; (2) "competitive history and geographical location," which are considered
26 | criteria "[o]f secondary importance"; and (3) "special circumstances." (*See* Ex 3., at
27 | 47 (emphasis added).) The Area Placement Criteria further state that, "[a] basic
28 | premise underlying this entire process is the recognition that the initial (first) request

1  of the individual member school represents the best source of information regarding
2  the welfare of that school [vis-à-vis] area placement." (*See id.* (emphasis added).)

3       56.    The Criteria, thus, prioritize the wellbeing of the school and its students
4  over all other considerations by requiring CIF-SS to accord primary importance to a
5  school's requested Area Placement.  As discussed below, in more detail, however,
6  Wigod   and   CIF-SS'   Executive   Committee   consistently   and   intentionally
7  misapplied—and  arbitrarily  and  capriciously  interpreted—the  terms  in  the  Area
8  Placement Criteria to avoid giving due weight to the Criteria that weighed against
9  their decision, and, instead, gave undue weight to other factors.

10      57.    The "initial request of the member school" criteria contains two sub-
11 paragraphs.  Subparagraph (a) states that where a school, using the Area Placement
12 form, requests to be moved to a <u>different</u> Area, that school "must provide rationale
13 based on the three criteria of enrollment, geography, and competitive equity."  This
14 statement corresponds to the requirement of the Area Placement form that a school
15 requesting placement in a different Area "address the criteria of school size,
16 competitive equity and geography."

17      58.    The Criteria further state that, as to those instances in which a school
18 requests placement in a new Area and there is a "placement dispute," "the criterion
19 of competitive equity shall weigh most heavily in making the placement."

20      59.    The Area Placement Criteria do not define any of the terms used in the
21 Criteria, such as "initial request of the member school," "competitive equity,"
22 "enrollment," "geography," "competitive history," "geographical location," or
23 "special circumstances."  The Criteria also do not describe the relationship between
24 seemingly overlapping terms—such as "competitive equity" and "competitive
25 history," or "geography" and "geographical location"—or indicate how CIF-SS will
26 consider the criteria.

27      60.    The Criteria, furthermore, do not indicate that the "three criteria" listed
28 in sub-paragraph (1)(a)—"enrollment, geography and competitive equity"—apply to

a school that asks to remain in the <u>same</u> Area, <u>i.e.</u>, a school that determines that it is in the best interests of its students to remain in the current Area and thus is not required to address those criteria on the Area Placement form.

61. Nevertheless, in subsequent meetings with the Religious High Schools before the Area Placement proposal was finalized and during the Religious High Schools' appeals, Wigod and members of the Executive Committee frequently referenced only three "criteria"—enrollment, competitive equity, and geography— and repeatedly stated that "competitive equity" would be weighed most heavily.

62. Throughout those meetings and subsequent appeals, neither Wigod nor any members of the Executive Committee referenced or considered the requests of the Religious High Schools, which the Area Placement Criteria themselves recognize are of primary importance because the school's request is the "best source of information regarding the welfare of the school."

63. The Area Placement Criteria do not authorize CIF-SS—specifically including, without limitation, its Commissioner and Executive Committee—to consider a school's status as religious or secular, or private or public, when making Area Placement recommendations and decisions.

64. Nevertheless, that is precisely what Wigod and some members of the Executive Committee did.

## III. Commissioner Wigod admitted that CIF-SS used its Area Placement process to segregate religious schools from public schools

65. On or about December 13, 2012, staff from CIF-SS, including Wigod, met with administrators from each of the Religious High Schools, individually, to permit the Religious High Schools to "present arguments" related to their placement in the Parochial Area. At these meetings, Wigod required the Religious High Schools to explain why they should not be moved to the Parochial Area, rather than presenting his reasons for wanting to move the Religious High Schools into the Parochial Area.

66.     During these meetings, Wigod required the Religious High Schools to limit their comments to the three criteria that he identified—enrollment, competitive history, and geography—and did not explain how those—or, indeed, any—factors supported his proposal to move each of the Religious High Schools to the Parochial Area.

67.     In one of the meetings, moreover, Wigod indicated that CIF-SS intended to move the Religious High Schools into the Parochial Area because it felt that religious schools properly belonged in the Parochial Area.  Specifically, in a meeting with staff from St. Lucy's, Wigod noted that St. Lucy's and Damien were the only two Catholic schools in the Mt. SAC Area, and CIF-SS thus felt that St. Lucy's and Damien should be moved from the Mt. SAC Area to the Parochial Area. Wigod further stated that CIF-SS was moving St. Lucy's and Damien to the Parochial Area because the Parochial Area was created for religious schools "like" them, and CIF-SS felt that St. Lucy's and Damien should find "like schools" to play.

68.     At that meeting, Wigod did not mention any other factor that he considered, or that CIF-SS would consider, in deciding whether to place St. Lucy's or the other Religious High Schools in the Parochial Area.

## IV.   Commissioner Wigod refused to explain why he moved Oaks Christian and the other Religious High Schools to the Parochial Area

69.     On or about January 19, 2013, CIF-SS' Executive Committee voted to approve Wigod's Area Placement recommendations over the objections of Oaks Christian, St. Bonaventure, St. Lucy's, and Damien, and scheduled Area Placement appeals for March 20, 2013.  CIF-SS further required each appealing school to submit a written notice of its intent to appeal to CIF-SS on or by March 6, 2013.

70.     On or about February 13, 2013, Oaks Christian's Athletic Director, Mr. Jan Hethcock, notified Wigod that Oaks Christian intended to appeal its placement in the Parochial Area.

71.     On or about March 6, 2013, Oaks Christian submitted a letter further notifying Wigod and CIF-SS of its intent to appeal the CIF-SS' January 19, 2013 Area Placement decision, and explaining its opposition to CIF-SS' decision, in detail. (*See* Ex. 4 (Letter from J. Woodcock to CIF-SS, dated March 5, 2013).)

72.     In its letter, Oaks Christian first addressed numerous ambiguities in the Area Placement Criteria and requested clarification about the ambiguities. Specifically, Oaks Christian noted that CIF-SS' Blue Book mentioned a number of potential criteria in the Area Placement Criteria—including the initial request of the member school, enrollment, geography, competitive equity, competitive history, special circumstances, and the welfare of the member school—but failed to (1) define these potential criteria; (2) describe the relationships, if any, between the potential criteria, which, in places, appeared to overlap; or (3) clearly identify the relative importance of each of these potential criteria.  Oaks Christian thus requested clarification—preferably in writing—regarding CIF-SS' application of the Area Placement Criteria. (*See* Ex. 4, at 53–54.)

73.     Oaks Christian's letter—consistent with the Area Placement Criteria— then addressed the negative effect of CIF-SS' decision on the welfare of Oaks Christian's students, their parents, and the School, itself, caused by geographic factors.  Specifically, moving Oaks Christian to the Parochial Area would (1) greatly increase the school's travel time, which would result in additional lost classroom time—potentially thousands of hours—for Oaks Christian's students, thereby negatively affecting the education of those students and potentially causing students to stop playing high school sports; (2) substantially decrease parental involvement in high school sports, given that Oaks Christian's sports teams would be playing far east of the geographic center of its student population, who, overwhelmingly, live west of Topanga Canyon; and (3) substantially increase the school's transportation costs. (*See* Ex. 4, at 54–55.)

74.     Finally, Oaks Christian addressed the remaining criteria that Wigod had repeatedly identified, including competitive equity and enrollment.  As to competitive equity, Oaks Christian (1) cited statistics demonstrating that Oaks Christian had increased the competitiveness of the Marmonte football league, and (2) pointed out that no statistics indicated that Oaks Christian would not be competitive in the Northern Area or, specifically, the Marmonte League.  As to enrollment, Oaks Christian noted that "enrollment deserve[d] no independent consideration" because Oaks Christian had demonstrated that it would be competitive in the Northern Area, and, specifically, the Marmonte League.  (*See* Ex. 4, at 55–56.)

75.     Oaks Christian did not receive a response from CIF-SS clarifying the terms used in the Area Placement Criteria or responding substantively to the concerns raised by Oaks Christian.  Oaks Christian thus twice sought clarification from Wigod by email—on or about March 11, 2013 and March 14, 2013—regarding the information he considered in making his Area Placement recommendations and how that information supported CIF-SS' decision to move Oaks Christian to the Parochial Area.

76.     Wigod failed to provide <u>any</u> justification for uprooting Oaks Christian from the Northern Area, where it had been for its entire existence.  Although Wigod stated that he would present (1) the enrollments of the Parochial Area high schools, (2) Oaks Christian's playoff performance, and (3) a geographic profile of the Parochial Area at Oaks Christian's appeal, he failed to indicate <u>how</u> the information he would present at Oaks Christian's appeal supported moving Oaks Christian away from the Northern Area or justified moving Oaks Christian to the Parochial Area.  Instead, Wigod merely stated, "I believe you fit into the Parochial Area because your school enrollment, competitive equity and geography fit into the group of schools that are in that area."  Apparently recognizing the lack of analysis that went into his decision to move Oaks Christian to the Parochial Area, Wigod noted, "I know you

1  are looking for some long list of factors but it is not as complicated as I think you

2  believe it is."

3       77.    The uncomplicated truth, which Wigod did not admit at the time, is that

4  Wigod and the CIF-SS' Executive Committee had decided to move Oaks Christian

5  to the Parochial Area in order to separate religious, private schools from public

6  schools.

7       78.    Wigod and CIF-SS also failed to explain to the other Religious High

8  Schools, prior to the Area Placement appeals, why they were being moved to the

9  Parochial Area and away from the CIF-SS Areas where they had competed for

10  several decades.

11  **V.   At the Area Placement appeals, CIF-SS' Executive Committee rubber-stamped Commissioner Wigod's decision without critically analyzing the Area Placement Criteria or considering the welfare of the students**

12

13

14       79.    On or about March 20, 2013, CIF-SS' Executive Committee heard the

15  appeals of the Religious High Schools, including Oaks Christian, regarding CIF-SS'

16  Area Placements.

17       80.    The Executive Committee that heard the appeals included the Officers

18  and Regular Members provided for in Article 7 of the Blue Book, and additional

19  individual representatives from the California Association of Directors of Activities

20  ("CADA"), the California Association of Private School Organizations ("CAPSO"),

21  the California State Athletic Directors Association ("CSADA"), and the California

22  Association for Health, Physical Education, Recreation, and Dance ("CAPHERD").

23       81.    At the outset of the Area Placement appeals, the four Religious High

24  Schools were informed that each appeal would be limited to 30 minutes, which

25  included a 5–10 minute presentation by Wigod, the school's response, and time for

26  the Executive Committee to ask questions or deliberate.  The school's presentation

27  was thus limited to 15–20 minutes, depending on the length of Wigod's presentation.

28

82.     Wigod began Oaks Christian's appeal by reviewing a "profile" of the Parochial Area.  He first talked about the history of the Parochial Area, and then discussed how adding Oaks Christian to the Parochial Area would change the geography of the Parochial Area.  He conceded that adding both St. Bonaventure and Oaks Christian would expand the western boundaries of the Parochial Area.

83.     Wigod's geographic argument for adding Oaks Christian to the Parochial Area, thus, amounted to nothing more than stating that he recognized that Oaks Christian was outside the boundaries of the existing Parochial Area, but that he felt it was appropriate to expand the Parochial Area's boundaries.

84.     Notably, Wigod did not address the geography of the Northern Area in any way, despite Oaks Christian's geographic location squarely within the Northern Area's boundaries.

85.     Wigod then addressed the criteria which he stated that the Blue Book specified for Area Placement—enrollment, competitive equity, and geography—and which he claimed, without support, to have applied in deciding to move Oaks Christian to the Parochial Area.

86.     Wigod first addressed enrollment size by simply noting that Oaks Christian would be the fifteenth largest school in the Parochial Area out of forty-three schools, including all the Religious High Schools.

87.     Wigod did not, however, discuss Oaks Christian's size relative to Northern Area schools, or suggest that Oaks Christian's enrollment made it inappropriately large or small for the Northern Area.  In short, Wigod did not state how the criterion of enrollment supported moving Oaks Christian from the Northern Area to the Parochial Area.

88.     Wigod next addressed the criterion of competitive equity, which he characterized as the most important criterion.  He first referenced a four-year "profile" of Oaks Christian's performance in CIF-SS' playoffs.  The profile that Wigod distributed only considered seven boys' sports and six girls' sports, however.

Wigod then stated that Oaks Christian would perform similarly to St. Bonaventure in the Parochial Area—the School would be successful in some sports and would struggle in others.

89.    At no time, however, did Wigod describe (1) how the four-year profile of Oaks Christian's playoff performance supported his conclusion that Oaks Christian was best suited for the Parochial Area for league play; (2) how Oaks Christian's playoff performance indicated that Oaks Christian was over- or under-competitive within the Northern Area; or (3) why Oaks Christian was better suited for the Parochial Area than the Northern Area. Wigod, in fact, never stated (4) that Oaks Christian was not competitive within the Northern Area.

90.    Finally, Wigod addressed the criterion of geography. His principal argument was that Oaks Christian was geographically closer to the boundaries of the Parochial Area than St. Bonaventure, which lost its appeal prior to Oaks Christian. Wigod further stated that Oaks Christian was 15.28 miles from Chaminade High School, which was its closest Parochial Area opponent. (Chaminade is 16 miles from Oaks Christian.)

91.    Wigod, however, did not address in any way how Oaks Christian's "geographic location"—one of the Area Placement Criteria—weighed in favor of moving the School out of the Northern Area and to the Parochial Area. Nor did Wigod address why Oaks Christian should be required to travel through heavily congested routes to Parochial Area schools that are farther away from Oaks Christian than many Northern Area schools, including those in the Marmonte League.

92.    Crucially, Wigod also wholly failed to address Oaks Christian's request to remain in the Northern Area and move to the Marmonte League, which the Area Placement Criteria contemplates is significant because the School is in the best position to know the effect of CIF-SS' Area Placement decision on its students, their parents, and the School, in general. Wigod also did not address any of the hardships that would result from moving Oaks Christian to the Parochial Area.

93.     Moreover, Wigod did not explain why he applied the criteria of enrollment, geography, and competitive equity to Oaks Christian, which was not a "school requesting placement in a different area."

94.     Despite Wigod's threadbare presentation, no member of the Executive Committee questioned him on <u>any</u> topic related to Oaks Christian's appeal, either at that point or following Oaks Christian's presentation.

95.     Following Wigod's presentation, Oaks Christian's headmaster, Mr. Jeff Woodcock, explained, in detail, how the Area Placement Criteria weighed in favor of Oaks Christian being placed in the Northern Area—rather than the Parochial Area—and, specifically, the Marmonte League. Mr. Woodcock's presentation substantially tracked the arguments that Oaks Christian made in its March 6, 2013 letter.

96.     Mr. Woodcock first specifically pointed out that one of central purposes of CIF and CIF-SS is to help guarantee the "educational opportunities of the students taking part in interscholastic athletics," and addressed the geography-based hardships that Oaks Christian would face if the School was moved to the Parochial Area, including the negative effect on student educations, a decrease in student and parental involvement in athletics, and a substantial increase in Oaks Christian's transportation costs. Second, Mr. Woodcock presented statistics demonstrating the competitiveness of Oaks Christian's athletic teams compared to Northern Area—specifically, Marmonte League—schools. Third, Mr. Woodcock discussed why enrollment did not favor moving Oaks Christian to the Parochial Area. Finally, Mr. Woodcock asserted that the hardships that would be caused by moving Oaks Christian to the Parochial Area were "special circumstances" that warranted keeping Oaks Christian in the Northern Area.

97.     The reaction of the majority of Executive Committee members to Wigod's and Mr. Woodcock's presentations indicated that the majority of Executive Committee members did not approach the appeal in a neutral manner, however. Following Oaks Christian's presentation, members of the CIF-SS Executive

Committee asked only one question of Oaks Christian and no questions to Wigod. As to Mr. Woodcock, an Executive Committee member merely asked him whether Oaks Christian could realistically compete in the Northern Area's Marmonte League, which Mr. Woodcock answered affirmatively.

98.   Another Executive Committee member—one of only two representatives on the Executive Committee from religious high schools—generally expressed the concern that CIF-SS' Executive Committee was improperly separating private schools from public schools.   No members of CIF-SS commented on his statement, however, and the Executive Committee proceeded to vote on Oaks Christian's appeal without having questioned Commissioner Wigod <u>at all</u>, despite the fact that Commissioner Wigod did not explain <u>how</u> the evidence he considered supported moving Oaks Christian from the Northern Area to the Parochial Area.

99.   A majority of the Executive Committee's members thus failed to consider whether Oaks Christian was accorded due process and whether the Area Placement Criteria were followed, despite the Blue Book's clear requirement that it was their duty to do so.

100.   Indeed, upon information and belief, it became apparent during a later appeal involving one of the other Religious High Schools that some Executive Committee members were unaware that the Blue Book, itself, required the Executive Committee to consider whether "due process [was] extended to the parties concerned."   At one point, for example, an Executive Committee member informed a representative of one of the Religious High Schools that the Executive Committee was <u>not</u> permitted to consider whether due process was extended to schools. Moreover, during Damien's appeal, the Executive Committee permitted Wigod to address it during the Executive Committee's deliberations, in violation of its rules, while it prevented a representative of Damien from addressing the Executive Committee at that time.

101. Similar events to what Oaks Christian experienced played out during the appeals of the other Religious High Schools, as well. In each appeal, Wigod (1) spoke generally about how the geographic area of the Parochial Area could be extended to include the particular school, without explaining how the school failed to fit better within the geography of its current Area; (2) referenced the school's enrollment relative to the Parochial Area, but not the Religious High School's current Area (either the Northern Area or Mt. SAC Area); (3) stated in a conclusory manner that the particular school would be competitive in the Parochial Area, but failed to explain how he arrived at that conclusion; (4) failed to state—or present evidence indicating—that the particular school would not be competitive in its present Area; and (5) did not consider the geographic impact of the school's move to the Parochial Area, other than to mention the distance from the school to its nearest Parochial Area rival.

102. Notably, at no point during any of the appeals did Wigod discuss any Religious High School's request to remain in its current Area—which the Area Placement Criteria states is the most important consideration—or consider the resultant hardship on the school, including the impact on student education. Remarkably, during the presentations, neither Wigod nor the any member of the Executive Committee asked, at any point, whether moving the Religious High Schools to the Parochial Area was in the best interest of the student-athletes.

103. During his presentations, Wigod also failed to publicly acknowledge that he based his recommendation that Oaks Christian and other Religious High Schools be moved to the Parochial Area on each Religious High School's status as a religious, private school, which he knew was not a legitimate criterion under the Area Placement Criteria.

104. Nevertheless, in each appeal, the Executive Committee rubber-stamped Wigod's decisions. The Executive Committee failed to make any findings, and, to the extent that it made findings, the Executive Committee did not support those

findings with evidence. A majority of the members of the CIF's Executive Committee voted to uphold their previous decision to move the Religious High Schools to the Parochial Area for the 2014–2018 cycle, and all four Religious High Schools thus lost their appeals.

## VI. CIF approved of CIF-SS' decision, and refused to provide any further appeal to Oaks Christian or the other Religious High Schools

105. Following the Area Placement appeals, the Religious High Schools contacted CIF to request that CIF provide a "neutral final appeals body" relating to the Religious High Schools' Area Placement appeals, which California Education Code § 33353(a) compels CIF and CIF-SS to institute in order "to hear complaints related to interscholastic athletic policies."

106. Given Wigod's statement to staff from St. Lucy's—that CIF-SS believed that St. Lucy's and other religious schools should play "like schools"—the Religious High Schools were concerned that CIF-SS' Executive Committee could not be fairly described as "neutral" at the time that it made its Area Placement and appeal decisions. Moreover, the Religious High Schools were also concerned because, by the time of the March 2013 Area Placement appeals, CIF-SS' Executive Committee had already taken a position on Wigod's Area Placement recommendations through its January 19, 2013 Area Placement decision.

107. In previous leaguing cycles, including in 1998, CIF had provided an independent five-member arbitration panel to adjudicate Area Placement issues. CIF ceased utilizing that process, however, following St. Lucy's and Damien's victory against CIF by a 5-0 margin in their 1998 Area Placement appeals. In the years since then, CIF has, nevertheless, certified to the Legislature and the Governor that it has provided a "neutral" appeals process. The process is not neutral, however.

108. The Religious High Schools thus requested a meeting with CIF in the hope that CIF could and would provide a remedy, such as an independent arbitration

1 panel, to what the Religious High Schools perceived was a flawed and non-neutral

2 Area Placement process.

3        109.  On or about April 16, 2013, representatives from the Religious High

4 Schools met with representatives from CIF-SS and CIF.  Although the Religious

5 High Schools, through their representatives, explained the numerous shortcomings of

6 the Area Placement decision and appeal process employed by CIF-SS—including,

7 without limitation, discussing CIF-SS' misapplication of the Area Placement

8 Criteria, the Executive Committee's lack of neutrality, and CIF-SS' troubling

9 violations of the United States and California Constitutions—neither CIF nor CIF-SS

10 responded substantively or offered any remedy.

11        110.  Specifically, following the meeting, a representative from CIF-SS

12 informed the Religious High Schools that CIF-SS would not reverse its Area

13 Placement decision.  Moreover, he stated that the Religious High Schools' concerns

14 about Education Code § 33353(a) did not implicate CIF-SS, but instead was a "[CIF]

15 State issue."

16        111.  CIF also declined to intervene in CIF-SS' Area Placement decision in

17 any way, including by providing for a "neutral final appeals body," as required by

18 the California Education Code, and instead deferred to CIF-SS' decision.

19 **VII.   The Catholic Athletic Association requires its members to accept and**
20        **teach Catholic doctrine**

21        112.  Oaks Christian, thus, has been placed by CIF-SS in the Parochial Area,

22 which is administered by the Catholic Athletic Association ("CAA"), for the 2014–

23 2018 school years.

24        113.  The CAA—and, thus, the Parochial Area—has bylaws, policies, and

25 procedures that are binding on the members of the CAA, including the principal of

26 any high school that is a member of the Parochial Area.  Oaks Christian must,

27 therefore, be a member of the CAA in order to meaningfully participate in the

28 Parochial Area, including, without limitation, by (1) offering proposals concerning

1 | interscholastic athletic programs; and (2) voting on matters concerning the Parochial
2 | Area, including its policies, regulations, and sanctions.

3 |     114.   The CAA, however, also has several rules and policies that impose
4 | Catholic teachings on its members.  Oaks Christian's principal, for example, would
5 | be required by the CAA's rules to ensure that his faculty and staff communicate
6 | Catholic philosophy to players, coaches, faculty, staff, parents and spectators.
7 | Members of the CAA are subject to sanctions for violating the spirit or letter of the
8 | CAA's policies and regulations.

9 |     115.   While Oaks Christian respects Catholic beliefs and traditions, Oaks
10 | Christian is not a Catholic school, is not affiliated with the Archdiocese of Los
11 | Angeles, and does not hold all the same religious beliefs as the CAA or its members.
12 | Although Oaks Christian previously informed Defendants CIF-SS, Wigod, and Does
13 | 1–23 of this, they nevertheless placed Oaks Christian in the Parochial Area.

14 |

15 | **CAUSES OF ACTION**
**FIRST CAUSE OF ACTION**
16 | **(Petition for Writ of Administrative Mandamus—Cal. Code Civ. Proc. § 1094.5)**
17 | **(Against Defendant CIF-SS)**

18 |     116.   Oaks Christian re-alleges and incorporates by reference each of the
19 | allegations in Paragraphs 1 through 115 of this Complaint as if fully set forth herein.

20 |     117.   Plaintiff Oaks Christian hereby petitions the Court for a writ of
21 | administrative mandamus to inquire into the validity of CIF-SS' final Area
22 | Placement decision, pursuant to Cal. Code Civ. Proc. § 1094.5.  Issuance of the writ
23 | is justified for the reasons set forth above and in the paragraphs below.

24 |     118.   CIF-SS was required at law, including, without limitation, by its Blue
25 | Book, to provide a hearing to Oaks Christian regarding Area Placement, at which it
26 | was required to hear and consider evidence.

27 |     119.   Discretion in the determination of facts at Oaks Christian's Area
28 | Placement appeal was vested in CIF-SS.

120. By requiring Oaks Christian to take its appeal before CIF-SS' Executive Committee, the decision of which was being appealed, Defendant CIF-SS failed to provide Oaks Christian with a fair hearing.

121. Moreover, CIF-SS acted in excess of its jurisdiction and abused its discretion by improperly constituting its Executive Committee to include individuals who, under CIF-SS' Constitution, were not members of the Executive Committee.

122. CIF-SS, additionally, failed to guarantee Oaks Christian's rights to due process under Article 1, Section 7 of the California Constitution—as set forth, in detail, in ¶¶ 169–176—and its Blue Book.

123. CIF-SS also failed to establish a "neutral final appeals panel" for Oaks Christian's Area Placement appeal, as required by California Education Code § 33353(a)

124. Moreover, CIF-SS abused its discretion by not properly applying its Area Placement Criteria, including, without limitation, by ignoring certain criteria, giving other criteria undue weight, considering criteria that did not apply to Oaks Christian, and considering criteria that were not enumerated in the Area Placement Criteria.

125. CIF-SS further abused its discretion by not supporting its decision with findings.

126. Finally, to the extent that CIF-SS made findings, CIF-SS abused its discretion by not supporting those findings with evidence.

127. CIF-SS' Area Placement decision was a final adjudication of Oaks Christian's Area Placement appeal, and Oaks Christian has exhausted its administrative remedies.

128. Oaks Christian has no other plain, speedy, or adequate remedy at law.

## SECOND CAUSE OF ACTION
**(Deprivation of Oaks Christian's Rights Under the First Amendment of the United States Constitution in Violation of 42 U.S.C. § 1983)**
**(Against all Defendants)**

129.   Oaks Christian re-alleges and incorporates by reference each of the allegations in Paragraphs 1 through 115 of this Complaint as if fully set forth herein.

130.   Defendants Wigod, Does 1–23, and CIF-SS ("Southern Section Defendants"), by their actions, directly and proximately caused Plaintiff Oaks Christian to be deprived of its rights under the First Amendment of the United States Constitution, in violation 42 U.S.C. § 1983.

131.   In doing the acts complained of herein, Southern Section Defendants were acting under color of state law.

132.   Southern Section Defendants explicitly favored non-religious schools by moving only religious schools to the Parochial Area, which impinges upon Oaks Christian's free exercise of religion, while not targeting similarly-situated non-religious schools.

133.   Southern Section Defendants' actions have also resulted in excessive entanglement with religion by delegating power to administer the Parochial Area to the Catholic Athletic Association, which is affiliated with the Archdiocese of Los Angeles.

134.   Moreover, Southern Section Defendants' actions violate Oaks Christian's freedom of expressive association by requiring it to participate in the Parochial Area, which has policies and rules enforcing Catholic morals and beliefs.

135.   Southern Section Defendants have no compelling justification for their actions.

136.   The Southern Section Defendants acted under the actual authority granted to them by CIF and Does 24–60 (collectively, the "CIF State Defendants"), and, therefore, the CIF State Defendants are liable for the actions of the Southern Section Defendants.

137.   In addition, the CIF State Defendants had full knowledge of the Southern Section Defendants' actions and subsequently ratified the actions by declining to revoke, overturn, or repudiate these actions.

138.   As a direct and proximate result of the deprivation of its First Amendment rights, Oaks Christian has incurred, and will incur, substantial harm and damage.

## THIRD CAUSE OF ACTION
**(Violation of Oaks Christian's Rights Under Article 1, Section 4 of the California Constitution)**
**(Against all Defendants)**

139.   Oaks Christian re-alleges and incorporates by reference each of the allegations in Paragraphs 1 through 115 of this Complaint as if fully set forth herein.

140.   Southern Section Defendants, by their actions, directly and proximately caused Plaintiff Oaks Christian to be deprived of its rights under the Article 1, Section 4 of the California Constitution.

141.   In doing the acts complained of herein, Southern Section Defendants were acting under color of state law.

142.   Southern Section Defendants expressed a preference for non-religious schools by moving only religious schools to the Parochial Area, and thus making religious schools travel longer distances in comparison to similarly-situated non-religious schools.

143.   Southern Section Defendants' actions have also resulted in excessive entanglement with religion by delegating power to administer the Parochial Area to the Catholic Athletic Association, which is affiliated with the Archdiocese of Los Angeles.

144.   Moreover, Southern Section Defendants' actions violate Oaks Christian's freedom of expressive association by requiring it to participate in the Parochial Area, which has policies and rules enforcing Catholic morals and beliefs.

145.   Southern Section Defendants have no compelling justification for their actions.

146.   The Southern Section Defendants acted under the actual authority granted to them by CIF State Defendants, and, therefore, the CIF State Defendants are liable for the actions of the Southern Section Defendants.

147.   In addition, the CIF State Defendants had full knowledge of the Southern Section Defendants' actions and subsequently ratified the actions by declining to revoke, overturn, or repudiate these actions.

148.   As a direct and proximate result of the deprivation of its right to free exercise of religion, Oaks Christian has incurred, and will incur, substantial harm and damage.

### FOURTH CAUSE OF ACTION
**(Deprivation of Oaks Christian's Right to Equal Protection under the United States Constitution in Violation of 42 U.S.C. § 1983)**
**(Against all Defendants)**

149.   Oaks Christian re-alleges and incorporates by reference each of the allegations in Paragraphs 1 through 115 of this Complaint as if fully set forth herein.

150.   Southern Section Defendants, by their actions, directly and proximately caused Plaintiff Oaks Christian to be deprived of its rights to equal protection in violation of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983.

151.   In doing the acts complained of herein, Southern Section Defendants were acting under color of state law.

152.   Southern Section Defendants applied the Area Placement Criteria in a discriminatory manner to intentionally require religious schools, including Oaks Christian, to play within the Parochial Area, while excluding similarly-situated non-religious schools from this requirement, solely because of Oaks Christian's status as a religious school.

153.   Southern Section Defendants have no compelling justification for these actions.

154.   In the alternative, Southern Section Defendants applied the Area Placement Criteria in a discriminatory manner to intentionally require private schools, including Oaks Christian, to play within the Parochial Area, while excluding similarly-situated public schools from this requirement, solely because of Oaks Christian's status as a private school.

155.   Southern Section Defendants have no rational basis for these actions.

156.   In all the facts alleged herein, the Southern Section Defendants acted under the actual authority granted to them by the CIF State Defendants, and, therefore, the CIF State Defendants are liable for the actions of the Southern Section Defendants.

157.   In addition, the CIF State Defendants had full knowledge of the Southern Section Defendants' actions and subsequently ratified the actions by declining to revoke, overturn, or repudiate these actions.

158.   As a direct and proximate result of the deprivation of its right to equal protection, Oaks Christian has incurred, and will incur, substantial harm and damage.

## FIFTH CAUSE OF ACTION
### (Violation of Oaks Christian's Right to Equal Protection under Article 1, Section 7 of the California Constitution)
### (Against all Defendants)

159.   Oaks Christian re-alleges and incorporates by reference each of the allegations in Paragraphs 1 through 115 of this Complaint as if fully set forth herein.

160.   Southern Section Defendants, by their actions, directly and proximately caused Plaintiff Oaks Christian to be deprived of its rights to equal protection in violation of the Article 1, Section 7 of the California Constitution.

161.   In doing the acts complained of herein, Southern Section Defendants were acting under color of state law.

162.   Southern Section Defendants applied the Area Placement Criteria in a discriminatory manner to intentionally require religious schools, including Oaks Christian, to play within the Parochial Area, while excluding similarly-situated non-religious schools from this requirement, solely because of Oaks Christian's status as a religious school.

163.   Southern Section Defendants have no compelling justification for these actions.

164.   In the alternative, Southern Section Defendants applied the Area Placement Criteria in a discriminatory manner to intentionally require private schools, including Oaks Christian, to play within the Parochial Area, while excluding similarly-situated public schools from this requirement, solely because of Oaks Christian's status as a private school.

165.   Southern Section Defendants have no rational basis for these actions.

166.   In all the facts alleged herein, the Southern Section Defendants acted under the actual authority granted to them by the CIF State Defendants, and, therefore, the CIF State Defendants are liable for the actions of the Southern Section Defendants.

167.   In addition, the CIF State Defendants had full knowledge of the Southern Section Defendants' actions and subsequently ratified the actions by declining to revoke, overturn, or repudiate these actions.

168.   As a direct and proximate result of the deprivation of its right to equal protection, Oaks Christian has incurred, and will incur, substantial harm and damage.

**SIXTH CAUSE OF ACTION**
**(Deprivation of Oaks Christian's Right to Procedural Due Process under the California Constitution)**
**(Against all Defendants)**

169.   Oaks Christian re-alleges and incorporates by reference each of the allegations in Paragraphs 1 through 115 of this Complaint as if fully set forth herein.

170.   Southern Section Defendants, by their actions, directly and proximately caused Plaintiff Oaks Christian to be deprived of due process rights under the Article 1, section 7 of the California Constitution.

171.   In doing the acts complained of herein, Southern Section Defendants were acting under color of state law.

172.   Southern Section Defendants also violated Oaks Christian's right to be free of arbitrary adjudicative procedures by failing to support its Area Placement decision with findings.

173.   Moreover, to the extent that CIF-SS made findings, CIF-SS violated Oaks Christian's right to be free of arbitrary adjudicative procedures by not supporting those findings with evidence.

174.   The Southern Section Defendants acted under the actual authority granted to them by the CIF State Defendants, and, therefore, the CIF State Defendants are liable for the actions of the Southern Section Defendants.

175.   In addition, the CIF State Defendants had full knowledge of the Southern Section Defendants' actions and subsequently ratified the actions by declining to revoke, overturn, or repudiate these actions.

176.   As a direct and proximate result of the deprivation of its procedural due process rights, Oaks Christian has incurred, and will incur, substantial harm and damage.

### SEVENTH CAUSE OF ACTION
### (Breach of Contract)
### (Against Defendants CIF and CIF-SS)

177.   Oaks Christian re-alleges and incorporates by reference each of the allegations in Paragraphs 1 through 115 of this Complaint as if fully set forth herein.

178.   CIF-SS' Constitution and Bylaws—as contained in the Blue Book, which incorporates Defendant CIF's Constitution and Bylaws—are binding upon Plaintiff Oaks Christian and Defendant CIF-SS, and thus constitute a written contract between Oaks Christian and CIF-SS.

179.   Moreover, CIF-SS is a California corporation, and thus its corporate Constitution and Bylaws constitute a binding contract between it and Oaks Christian, as a member of the corporation.

180.   The terms of the contract between CIF-SS and Oaks Christian are set forth in CIF-SS' 2012–2013 Blue Book.

181.   At all times relevant to this matter, Oaks Christian has performed all terms, conditions, covenants, and promises required by the terms of its contract with CIF-SS.

182.   CIF's Constitution and Bylaws are binding upon Oaks Christian and Defendant CIF, and thus constitute a written contract between Oaks Christian and CIF.

183.   Moreover, CIF is a California corporation, and thus its corporate Constitution and Bylaws constitute a binding contract between it and Oaks Christian, as a member of the corporation.

184.   The terms of the contract between CIF and Oaks Christian are set forth in CIF's 2012–2013 Constitution and Bylaws.

185.   At all times relevant to this matter, Oaks Christian has performed all terms, conditions, covenants, and promises required by the terms of its contract with CIF.

186.   CIF-SS and CIF materially breached their contracts with Oaks Christian by failing to establish a "neutral final appeals panel" for Oaks Christian's Area Placement appeal, as required by California Education Code § 33353(a).

187.   CIF-SS also materially breached its contract with Oaks Christian by deviating from its Area Placement criteria, and in a fashion that violates the intent and purpose of CIF-SS; by discriminating against the School on the basis of its religious affiliation, in contravention of the Blue Book's non-discrimination policies; and by improperly constituting its Executive Committee, by including individuals as

1 | members who were not authorized by CIF-SS' Constitution to serve on the
2 | Executive Committee.

3 | 188. The Southern Section Defendants acted under the actual authority
4 | granted to them by the CIF State Defendants, and, therefore, CIF is liable for the
5 | actions of the Southern Section Defendants.

6 | 189. In addition, the CIF State Defendants had full knowledge of the
7 | Southern Section Defendants' actions and subsequently ratified the actions by
8 | declining to revoke, overturn, or repudiate these actions.

9 | 190. As a direct and proximate result of these material breaches of the terms,
10 | conditions, covenants, and promises of the contract, Oaks Christian has incurred, and
11 | will incur, substantial harm and damage.

12 |
13 | **EIGHTH CAUSE OF ACTION**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**
14 | **(Against Defendants CIF and CIF-SS)**

15 | 191. Oaks Christian re-alleges and incorporates by reference each of the
16 | allegations in Paragraphs 1 through 115 and 178 through 185 of this Complaint as if
17 | fully set forth herein.

18 | 192. CIF-SS holds discretionary power over Oaks Christian in Area
19 | Placement decisions pursuant to their contract, and thus has a duty to exercise its
20 | power with good faith and fairly.

21 | 193. CIF-SS, however, breached its duties by rendering its initial Area
22 | Placement decision on or about January 19, 2013 without providing any explanation
23 | as to how the Area Placement Criteria were applied.

24 | 194. CIF-SS also breached its duties after the initial Area Placement decision
25 | by refusing to provide Oaks Christian with any information regarding how the Area
26 | Placement Criteria were applied, despite Oaks Christian's repeated requests for
27 | clarification.

28 |

195. Moreover, CIF-SS breached its duties by failing to critically analyze Wigod's misapplication of the Area Placement Criteria, and, instead, rubber-stamping his flawed decision, which was not supported by any evidence or reasoning.

196. CIF, in turn, has discretionary authority over CIF-SS and Oaks Christian pursuant to its contract with Oaks Christian, and is required by California Education Code § 33353(a) to establish a "neutral final appeals panel."

197. CIF, however, also failed to act in good faith, and, instead, with full knowledge of the Southern Section Defendants' actions, subsequently ratified the actions by declining to revoke, overturn, or repudiate said actions.

198. As a direct and proximate result of these material breaches of the implied covenant of good faith and fair dealing, Oaks Christian has incurred, and will incur, substantial harm and damage.

## NINTH CAUSE OF ACTION
### (Breach of Fiduciary Duties)
### (Against Defendants Wigod, Does 1–23, and Does 24–60)

199. Oaks Christian re-alleges and incorporates by reference each of the allegations in Paragraphs 1 through 115 of this Complaint as if fully set forth herein.

200. As directors of corporations, of which Oaks Christian is a member, Defendants Wigod, Does 1–23, and Does 24–60 are fiduciaries who are required to exercise their powers in accordance with the duties imposed by the California Corporations Code, and owe duties of loyalty and due care to Oaks Christian.

201. Defendants Wigod and Does 1–23 breached their duty of loyalty by making their Area Placement recommendation and decision to the detriment of Oaks Christian without proper justification—including, without limitation, by failing to (1) properly apply its Area Placement Criteria, including, without limitation, by ignoring certain criteria, giving other criteria undue weight, considering criteria that did not apply to Oaks Christian, and considering criteria that were not enumerated in the Area Placement Criteria; (2) consider whether Oaks Christian was afforded due

process; (3) establish a "neutral final appeals panel" for Oaks Christian's Area Placement appeal, as required by California Education Code § 33353(a); and (4) properly constitute the Executive Committee that made the Area Placement decision and heard Oaks Christian's appeal—and thus failing to provide a meaningful appeals process.

202. Does 24–60 breached their duty of loyalty by ratifying the Area Placement decision to the detriment of Oaks Christian without proper justification, and thus failing to provide a meaningful appeals process; and failing to challenge CIF-SS' actions done in direct violation of the CIF-SS' own Area Placement Criteria, CIF's Constitution and Bylaws, and California Education Code § 33353.

203. As a direct and proximate result of these material breaches of the Defendants' fiduciary duties, Oaks Christian has incurred, and will incur, substantial harm and damage.

## TENTH CAUSE OF ACTION
### (Violation of California Education Code § 33353(a))
### (Against Defendants CIF and CIF-SS)

204. Oaks Christian re-alleges and incorporates by reference each of the allegations in Paragraphs 1 through 115 of this Complaint as if fully set forth herein.

205. Defendants CIF and CIF-SS violated California Education Code § 33353(a) by failing to "[e]stablish a neutral final appeals body" to hear Oaks Christian's Area Placement appeal, which is related to CIF and CIF-SS' "interscholastic athletic policies."

206. Defendants CIF and CIF-SS' violation of section 33353(a) is knowing, intentional, and ongoing. Oaks Christian notified both defendants about their violation of the Education Code, and requested that they remedy it. Defendants CIF and CIF-SS, however, declined to provide a neutral appeals body.

207. As of the filing of this Complaint, the California Department of Education and State Board of Education also have refused to address CIF or CIF-SS' violation of section 33353(a), or to enforce that provision of the Education Code.

1       208.   Section 33353(a) creates an independent right to a neutral, final appeals

2   body.

3       209.   Oaks Christian, therefore, has an implied private right of action to

4   remedy the violation of § 33353(a).

5       210.   Oaks Christian has no other plain, speedy, or adequate remedy at law.

6       211.   As a direct and proximate result of these violations of California

7   Education Code § 33353(a), Oaks Christian has incurred, and will incur, substantial

8   harm and damage.

9   \

10   \

11   \

12   \

13   \

14   \

15   \

16   \

17   \

18   \

19   \

20   \

21   \

22   \

23   \

24   \

25   \

26   \

27   \

28   \

## PRAYER FOR RELIEF

WHEREFORE, Oaks Christian School prays for judgment and relief against Defendants California Interscholastic Federation Southern Section, California Interscholastic Federation, Robert L. Wigod, Does 1–23, and Does 24–60 (collectively "Defendants") as follows:

1.  Issuance of a writ of administrative mandamus pursuant to CCP § 1094.5;

2.  For injunctive relief in the form of an Order from this Court that directs Defendants to:

    a.  Cease and desist engaging in the unlawful conduct described herein;

    b.  Cease and desist enforcement of the Area Placement decision to place Oaks Christian School in the Parochial Area;

    c.  Follow, abide by, administer, and enforce all provisions of the Blue Book in a fair, reasonable, consistent, unbiased, and just manner; and

    d.  Adopt and publish objective definitions and explanations of the terms "competitive equity," "competitive history," "geography," "geographical location," and "special circumstances," as the terms are used in the Blue Book's Area Placement Criteria;

3.  For specific performance of all processes, procedures, rules, and regulations set forth in the Blue Book;

4.  For attorneys' fees and costs incurred and expended by Oaks Christian School, according to proof, to the extent allowed by contract and applicable law, including, without limitation, section 1717 of the California Civil Code and 42 U.S.C. § 1988.

1  DATED:  June 20, 2013

2

3

4            By_____
                           Jack P. DiCanio
5                          Attorney for Plaintiff
                           OAKS CHRISTIAN SCHOOL

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1



NORTHERN, PAROCHIAL, AND MT. SAC AREA SCHOOLS

Northern Area *

Parochial Area

Mt. Sac Area

*For the Northern Area, only the Marmonte and Tri-County Leagues are pictured.

ST. BONAVENTURE

OAKS CHRISTIAN

ST. LUCY'S

DAMIEN

# Exhibit 2



# Exhibit 3



**Celebrating 100 years
"A Century of Champions
Academics, Integrity, Athletics"**

# BLUE BOOK

## 2012-2013
## Constitution & Bylaws



# ARTICLE 3

## SOUTHERN SECTION - COUNCIL

30.     The governing body of this organization shall be known as the Council of the CIF Southern Section.

      30.1     CIF Southern Section Council may entertain proposals submitted to the governing board on the appropriate proposal form from duly appointed advisory committees, leagues or the Executive Committee.  Sport Advisory Committees may submit proposals whose scope is confined to the conduct of their respective sports.

      SPECIAL NOTE:  ALL ITEMS COMING BEFORE THE SOUTHERN SECTION COUNCIL MUST CONTAIN THE FINANCIAL IMPLICATIONS ON MEMBER SCHOOLS, LEAGUE AND THE SOUTHERN SECTION.

31.     Each established league shall no later than the April Council meeting of each school year elect a representative to the Council for the succeeding year.  Membership on the Council, with the exception of the At-Large Representative,  shall be confined to superintendents, principals, assistant principals, vice principals and athletic directors.  Alternates designated to attend Council meetings must also meet the above qualifications; no other representatives (i.e., coach) shall have voting privileges.

| QUESTION: | If a person retires from the teaching profession, may he/she continue to serve as a Council Representative? |
|---|---|
| ANSWER: | No - In order to serve, a person must be actively engaged in the teaching profession. |

32.     The Council shall be the legislative body of the CIF Southern Section and shall exercise the following powers:

      32.1     Make all rules and regulations governing eligibility of athletes.

      32.2     Make all rules and regulations regarding the conduct of the business of the CIF Southern Section.

      32.3     Make changes in, or amendments to, the Constitution and Bylaws, or other rules of the Southern Section.

      32.4     Fix and enforce penalties for any violation of the Constitution, Bylaws, or other rules of the Southern Section.

      32.5     Group member schools of the CIF Southern Section into leagues, or place on a free lance basis for a four-year cycle effective with even numbered years (2010-2014, etc.).  This approval to be accomplished by September during the odd-numbered years (011, 13, etc.) under the following procedures.

## A. AREA PLACEMENT PROCESS

      1.     The principal of each member school will request a specific area placement for his or her school. Such requests will be submitted to the CIF-SS Re-leaguing Committee for study/action.  (January 2011)

      2.     After a review of the various individual requests from principals of member schools, CIF-SS staff will prepare a recommended area placement configuration for all schools in the Section. The Office Staff will announce the configuration and submit to all league representatives.

      3.     After the proposed configuration is announced, Section Staff will hold a meeting to take input from any affected school in regards to that school's area placement. The purpose of the meeting is to hear arguments on why a school should not be placed in the recommended area. Section Commissioner will set the conduct of the meeting, time and place.

      4.     The area placement of member schools, as recommended by Staff, will be submitted to the Executive Committee for Approval. If the proposal re-configures an area(s) the Committee will vote on appropriate representation if the proposal reduces the number of areas within the Section.

      5.     Member schools or league representatives seeking an appeal with reference to area placement must forward a copy of the appeal to the CIF Southern Section Office, and a copy to the principals of the affected area schools. This must be completed at least 14 calendar days prior to the scheduled date of the executive Committee meeting.

6.      The Executive committee, in accordance with the following guidelines, will hear appeals with reference to area placement:

(a)    Was due process extended to the parties concerned?

(b)    Was the Brown Act followed?

(c)    Were Blue Book rules and criteria followed?

All decisions made by the Executive Committee at that time will be final. Area placements will be subject to review every four (4) years in odd years and will be concluded prior to the start of the re-leaguing process.

7.      SPECIAL CIRCUMSTANCES:

(a)    The Executive Committee will review special circumstances, which create cause for possible deviation for the normal area placement cycle.

(b)    Special circumstance issues may be presented to the Executive Committee either by a member school or group of schools by October 1 of an "off-cycle" year. (This timeline may be accelerated in specific cases at Executive Committee discretion.)

(c)    Special circumstances requests must be accompanied by proposed solutions for all impacted parties (e.g. free lance area, independent status, new area alignment, including possible new league placement).

(d)    If a change in area placement is deemed warranted by the Executive Committee, such change shall be recommended to the Council for ratification.

(e)    Any school that perceives itself to be adversely affected by the Area Placement recommendation of the Executive Committee has the option of seeking placement in some other league, or opting for freelance status, if such can be finalized by a date determined by the Executive Committee.

## CRITERIA FOR AREA PLACEMENT

The criteria used by Southern Section staff for area placement and for the adjudication of appeals related to area placement will be limited to the following:

1.      The initial request of the member school.

(a)    The school requesting placement in a different area must provide rationale based on the three criteria of enrollment, geography and competitive equity.

(b)    In cases of a placement disputes, the criterion of competitive equity shall weigh most heavily in making the placement.

2.      Of secondary importance, but part of the criteria, are the school's competitive history and geographical location.

3.      Special circumstances which; in the judgment of the Executive Committee provide good cause to deviate from the above criteria. Such circumstances might include anomalies related to enrollment, geography, and special features of school athletic programs, e.g. all-boys/girls.

A basic premise underlying this entire process is the recognition that the initial (first) request of the individual member school represents the best source of information regarding the welfare of that school vis a vis area placement. The Executive Committee shall review the request of the member school at the time the member school is accepted for membership in the Southern Section.

## B. RELEAGUING PROCEDURES

1. In each area, the designated Chairperson of the CIF Southern Section Re-leaguing Committee will be responsible for calling no less than one required meeting of representatives from member schools assigned to that specific area.

   At the meeting, or ensuing meetings, the representatives will be responsible for developing procedures for re-leaguing and a proposal reflecting the new league alignments. Voting procedures at the meeting are restricted to schools that are members of the organization at that time (in operation with student bodies).

2. Re-leaguing may take place every two years (even years) optional.

3. After receipt of the area proposal, the Re-leaguing Committee shall designate a time and place for hearings. Each league or member school in disagreement with the area proposal shall have an opportunity to express the rationale for its objection and to submit an alternative proposal.

QUESTION: May a school that has not opened but identified and plans to open, vote as it relates to the area releaguing process?

ANSWER: New schools that are assigned through the area placement process may participate in the area releaguing considerations provided a simple majority of the principals in the specific area approve.

QUESTION: What is the recommended criteria for releaguing?

ANSWER: It is recommended by the CIF Southern Section that the following criteria be observed with regard to releaguing procedures.

.....Enrollment
.....Geography
.....Competitive Equity (strength of program, sport offered)

In order to develop balance in the releaguing process, the above criteria should be given equal weight.

QUESTION: Can changes be made with regard to league membership during the releaguing cycle i.e.,2010-2014?

ANSWER: Yes. Mid-cycle changes must have unanimous approval of all affected schools in existing leagues. New Leagues may not be formed until the next releaguing cycle.

## RELEAGUING APPEALS PROCEDURES

In order to provide protocol, a member school seeking an appeal is directed to forward a copy of the appeal to the CIF Southern Section Office, a copy to the Area Releaguing Chairperson(s) and a copy to the principals of all schools assigned to the respective area(s). This must be completed at least 14 calendar days prior to the scheduled date of the appeal meeting.

1. The Executive Committee will hear all initial appeals with regard to the re-leaguing criteria and process. The Executive Committee may accept the appeal, in which case the Re-leaguing Chair for the respective area will re-convene to consider suggestions from the Committee and possibly make changes to the original (proposal). The Executive Committee shall make no recommendations or approve alternative appeal configurations.

2. If a proposal is remanded back to its area, the area must re-consider and vote on a configuration. The configuration will be forwarded to all member schools in that area. The Executive Committee will review the configuration and move it forward to Council.

3. The original area proposal or any proposals resulting from an appeal by a member school shall be voted upon at the October Council meeting. The procedure for voting will be: (1) the original area proposal will be voted upon first and must secure a majority vote for passage (a tie vote would not be considered as passage); (2) If the original proposal receives the necessary majority vote, appeals may be heard from affected schools in that area (any school that plans to appeal shall submit to the Council representatives an alternate proposal two weeks before scheduled Council meeting, with copies to the CIF-Southern Section Office. If the original proposal fails to secure the necessary majority vote, member school(s) from that area may submit a proposal before the Council for consideration. Only proposals that receive a motion to approve, a second, and majority vote of Council will be heard. Any proposal that reaches the floor of Council must have been previously submitted to all Council representatives. The Council at large will conduct voting on alternate proposals. Any proposal receiving a majority vote of Council is final.

33. The members of the Council from the leagues shall be the official CIF Southern Section Representatives in the leagues to see that CIF Southern Section rules and regulations are understood and enforced by the individual schools, and also to see that all protests brought to the attention of the league, are properly investigated and tried by the league.

34. Voting shall be by leagues, and each league shall be entitled to one vote.

35. The nominees from among those eligible for election who receive the most votes, will be elected.

36. A quorum of the Council shall consist of a majority of Council members.

# ARTICLE 4

## SOUTHERN SECTION - COUNCIL MEETINGS

40. There shall be no less than three (3) regular meetings of the Council each school year.  The meetings shall be October, January, and April except as set otherwise by the Executive Committee.  These meetings shall be called to order at an hour set by the President, and leagues which are not represented in at least one of the regular meetings during the year may be suspended for the following semester.

    NOTE:  Superintendents, principals, physical education supervisors and coaches are privileged to attend and address any meeting but may not vote.  Their respective votes are channeled through the respective leagues.

41. Special meetings may be called by the President at any time.  The President shall call a special meeting when requested to do so by a majority of the Executive Committee.

42. Meetings of the CIF-SS Council and Executive Committee are open to the public and subject to the provisions of the Ralph M. Brown Act (Government Code Section 54950 et. Seq.) of the State of California.

# ARTICLE 5

## SOUTHERN SECTION - OFFICERS

50. The officers of the Council shall consist of a President, President-Elect, Past President, Commissioner of Athletics, and Treasurer.

### PRESIDENT

51. The President shall be elected by the Council for a two-year term.  Presidents may not succeed themselves.  The President-Elect of the Council who has served two years in a satisfactory manner shall qualify for the presidency.  The duties of the President shall be such as usually appertain to the office, and the President shall also serve as chairperson of the Executive Committee and as a Southern Section representative to the State Federated Council.

### PRESIDENT-ELECT

52. The President-Elect shall be elected by the Council for a two-year term.  Presidents-Elect may not succeed themselves.  To qualify as a candidate for President-Elect, a person must have been a league representative for a least two years and/or have served on the Executive Committee for at least one year.  The President-Elect would not have to be a member of the Council or the Executive Committee at the time of the election.  The duties of the President-Elect shall be such as usually appertain to the office, and the President-Elect shall serve as a member of the Executive Committee and as a Southern Section representative to the State Federated Council.

### IMMEDIATE PAST-PRESIDENT

53. The Immediate Past-President shall serve on the Executive Committee for the duration of the President's tenure and shall also serve as a Southern Section representative to the State Federated Council.

### COMMISSIONER

54. The Commissioner of Athletics shall be selected by the Executive Committee, and may be elected to a term of from one to four years, with an annual salary fixed by the Executive Committee and made payable monthly.

    54.1 The Commissioner shall act as Secretary of the Council and as an ex-officio member of all standing committees.

54.2 The Commissioner shall manage the Southern Section championships in all lines of sports in which championships are authorized by the Council, and be responsible for distributing courtesy cards.

54.3 The Commissioner shall be governed in the management of each championship by the rules of the CIF Southern Section.

54.4 The Commissioner shall interpret all rules and regulations of the organization, and these interpretations will be final until such time as the Executive Committee rules otherwise.

54.5 The Commissioner shall issue a bulletin periodically during the school year covering the work of the CIF Southern Section. This bulletin shall contain the current Executive Committee meeting minutes, the Council meeting minutes and committee reports.

54.6 The Commissioner or designated representative shall attend the regular meetings of the Officials' Associations of Southern California, or otherwise keep in touch with their work.

54.7 The Commissioner may investigate all violations of CIF Southern Section rules and policies by a league, school or individual, that come to the attention of the office. The Commissioner may determine whether to apply sanctions/penalties and/or submit a report of the findings to the Executive Committee.

54.8 In emergency situations, the Southern Section President or Commissioner with approval of the Administrative Committee may act for the Southern Section Council when necessary. This action will be communicated to the Executive Committee prior to enactment, whenever possible.

Between meetings of the Southern Section Council, the Executive Committee shall be empowered to act for the Southern Section Council when necessary. Any actions taken by the Executive Committee will be subject to review by the Southern Section Council at their next meeting.

Emergency situations would include, but not be limited to, those involving disasters, fires, earthquakes, or situations of extraordinary significance affecting member schools and their athletes.

## TREASURER

55. The Treasurer shall be elected by the Council for a three-year term, subject to re-election for one additional term. The Treasurer shall, with the Commissioner of Athletics, be responsible for handling the finances of the CIF Southern Section. The Treasurer may sign checks for the payment of bills of the CIF Southern Section when checks are accompanied by an invoice approved by the Commissioner of Athletics. The Treasurer shall be an ex-officio member of the Executive Committee. The Treasurer shall have the same qualifications as other Executive Committee members.

# ARTICLE 6

## SOUTHERN SECTION - STATE REPRESENTATIVES

60. The President, President-Elect, and immediate Past President of the Council shall serve as three of the four Southern Section representatives to the State Federated Council during the duration of their Southern Section Office.

61. One member of the Executive Committee, other than the Council President, President-Elect, or Immediate Past President, shall be appointed by the Executive Committee every two years to serve as one of the four Southern Section Representatives to the State Federated Council. Any voting member of the State Federated Council shall serve on the Executive Committee.

61.1 One regular Southern Section Representative shall be a woman. See State Constitution, Article 2, Section 20.

# ARTICLE 7

## SOUTHERN SECTION - EXECUTIVE COMMITTEE

70. The Executive Committee of the CIF Southern Section shall consist of the following:

70.1 Council Officers:
President
President-Elect
Past President
Treasurer

**70.2    Regular Members:**

Activities Director Representative
Area Representatives (nine)
At-Large Representative
Boys' Athletic Directors' Representative
Girls' Athletic Directors' Representative
School Board Member Representative
Superintendents' Representative

70.2.1    Regular members of the Executive Committee shall be elected to four-year terms at the regular April meeting of the Council. The full Council shall vote for all members of the Executive Committee except the nine area representatives who shall be elected to four-year terms by specified leagues.

70.3    The area representatives shall be elected by, and responsible to, specific leagues as determined by the Executive Committee.

70.4    A regular member of the Executive Committee, who has served two consecutive full terms of office, will not be eligible for re-election until one year has elapsed following the second term.

70.5    With the exception of Past-President, membership on the Executive Committee shall be confined to school board members (for school board office), superintendents, assistant superintendents, district level administrators, site administrators, principals, assistant principals, vice principals, athletic directors (for athletic director's offices) and activities directors (for activities director's office) who have served in these positions in an administrative capacity in a CIF Southern Section school/district for two or more years. NOTE: No geographical area shall have more than THREE persons from that area on the Executive Committee.

70.5.1    EXCEPTIONS TO Bylaw 70.5:

1. Southern Section At-Large Representative

2. School Board Representative

70.6    An "At-Large" member of the Executive Committee will be appointed to assure appropriate representation of various populations within the Southern Section.

70.6.1    The Executive Committee will identify and announce the needed representation.

70.6.2    League representatives may make nominations accompanied by supporting qualifications and background information.

70.6.3    The Executive Committee will proceed with consideration of all nominees and make an appointment to fill the needed representation.

70.6.4    The appointment of an At-Large position will be for a two-year term with one term renewable.

QUESTION:    If a person retires from the teaching profession, may that individual continue to serve as a member of the Executive Committee or as a Council Representative?

ANSWER:    No - In order to serve in either capacity, a person must be actively engaged in the teaching profession. The only exception to this would be if the individual qualifies under Bylaw 70.5 as a voting member of the State Federated Council. This would not be construed as being in violation in that the individual is representing no specific area not holding any office as it relates to the Southern Section Executive Committee and/or Council. HOWEVER, A FORMER MEMBER OF THE EXECUTIVE COMMITTEE MAY SERVE ON HEARING PANELS.

70.7    The Executive Committee shall be the administrative body of the CIF Southern Section, and it shall enforce all rules and regulations approved by the Council of the CIF Southern Section, and can consider all questions related to a violation of such rules and regulations.

70.8    The Executive Committee shall hold no less than six regular meetings during the school year. These meetings shall occur at the call of the Chairperson. Special meetings may be called by the Commissioner of Athletics on the advice of the President.

70.9    The Commissioner of Athletics shall attend all meetings of the Executive Committee and serve as its secretary.

70.10    The Executive Committee will appoint up to five At-Large representatives to the CIF-SS Council to provide more balanced representation of the gender and ethnic composition of the Section. These At-Large representatives shall have the same status and voting privileges as other Council representatives.

    1.    The Executive Committee will survey the principals of the section and identify needed additional representation.

    2.    Section principals and leagues will be encouraged to make nominations accompanied by supporting qualifications and background information.

    3.    The Executive Committee will consider nominees and make appointments to fill representational needs.

    4.    Executive Committee appointments will be ratified by the Council at the next Council meeting.

    5.    At-Large representatives will be appointed for a two (2) year term with one term renewable.

71.    The proceedings of the Executive Committee at each of its regular meetings shall be published and sent to all member schools of the CIF Southern Section.

72.    Rulings and interpretations made by the Executive Committee shall be published and sent to all member schools of the CIF Southern Section.

73.    A member of the Executive Committee may be removed from office at any regular meeting of the Council or at a special meeting called for that purpose by a two-thirds vote of the Council members present.

74.    Any vacancy in the Executive Committee that may occur during the school year shall be filled by Executive Committee appointment. This appointment shall terminate at the regular Council meeting in April, at which time there shall be an election for a full term of office.

75.    A quorum of the Executive Committee shall consist of a majority of Executive Committee members.

# ARTICLE 8

## SOUTHERN SECTION - NOMINATING COMMITTEE

80.    The six-member Nominating Committee of the CIF Southern Section shall consist of one representative each from the Northern, Eastern, Orange and Los Angeles County areas, as well as a representative from the parochial schools and one from the private schools. The Council President and the Commissioner of Athletics shall be ex-officio members of the Nominating Committee.

81.    Members of the Nominating Committee shall be appointed by the President of the Council by the October Council meeting. Members of the committee shall serve for a period of one year and shall be appointed from any member of the Council except the members of the Executive Committee.

82.    The duties of the Nominating Committee shall be to place in nomination the names of not less than two candidates for each vacancy occurring in the offices of President-Elect, Treasurer, and Executive Committee. The report of the Nominating Committee shall be made at the March meeting of the Council. Nominations will also be accepted from the floor at this meeting.

# ARTICLE 9

## SOUTHERN SECTION - AMENDMENTS

90.    This Constitution may be amended by a two-thirds vote of the membership present at any regular meeting held not less than four weeks after a meeting at which the proposed amendment was presented in writing.

91.    This Constitution may be amended at any regular meeting by a unanimous vote of all the members present when the proposed amendment was not presented at least four weeks previous to such regular meeting.

# Exhibit 4



March 5, 2013

Executive Committee
CIF–Southern Section
10932 Pine St.
Los Alamitos, CA 90720

RE:   Appeal of 2014–2018 Area Placement Recommendations

Dear Commissioner Wigod and members of the Executive Committee:

I am writing on behalf of Oaks Christian School to appeal the CIF Southern Section Executive Committee's 2014 – 2018 Area Placement Recommendations, which were issued in final form on January 19, 2013.  This letter is intended to supplement my November 29, 2012 letter.

Oaks Christian respects the Southern Section and its leadership, and continues to take pride in its membership in the Southern Section, but we strongly oppose the recommendation that Oaks Christian be moved into the Parochial Area.  We, instead, request that the Executive Committee keep Oaks Christian in the Northern Area, and, during the next re-leaguing cycle, move it to the Marmonte League for all sports.

I address our concerns, in turn, below.

**Criteria for Area Placement**

At the outset, I note that Oaks Christian has not received any justification, or heard a rationale, from the Southern Section for why it recommends moving Oaks Christian from the Northern Area to the Parochial Area.  We are, therefore, left to infer the criteria that the Southern Section considered in making its decision.

Although the Southern Section's constitution—contained within the Blue Book— prescribes "Criteria for Area Placement" (Article 3, ¶ 32.5), we are unclear about the exact factors that the Executive Committee considers.  The Executive Committee must apply the criteria specified in its constitution, but those criteria are vague.   The constitution specifies a number of criteria—including the initial request of the member school, enrollment, geography, competitive equity, competitive history, special circumstances, and the welfare of the member school—but does not (1) define these criteria; (2) describe the relationships, if any, between the criteria (which, at times, appear to overlap); or (3) clearly identify the relative importance of each of these criteria.

Given our lack of understanding regarding the Southern Section's recommendation that Oaks Christian be moved to the Parochial Area and vagueness within the Criteria for Area Placement, we are concerned that Oaks Christian has not been accorded due process.   We, therefore, request that you provide some explanation, either in a

conversation or in writing, regarding the Southern Section's decision to move Oaks Christian from the Northern Area to the Parochial Area, *before* the March 20, 2013 Executive Committee meeting.   We think that having more information about the Executive Committee's decision will allow us to provide a more effective presentation by tailoring it to address the Committee's specific concerns.

### Hardship on Our Students, Their Parents, and Oaks Christian School

We are deeply concerned that the Southern Section's decision to move Oaks Christian to the Parochial Area will have detrimental effects on our students, their parents, and our school, which strongly weighs in favor of placing Oaks Christian in the Northern Area, within the Marmonte League.

#### *Student Education*

We believe that moving to a Parochial Area league will adversely impact our students' academic performance.   Oaks Christian has a rigorous college preparatory academic program, which includes graduation standards that require ample study time.   The academic day, for example, does not end until 3:15 PM, and many of our student athletes are enrolled in rigorous AP and honors classes.

Although the Parochial Area has several leagues, the nucleus of each league is far away from Oaks Christian.   Only three schools within the entire Parochial Area, for example, are within 20 miles of Oaks Christian.   In order to travel to *any* of the Parochial Area's schools, Oaks Christian students would need to travel east along Los Angeles County's 101/405 corridor, which is well-documented as one of the nation's busiest roadways.   As anyone who has traveled on the 101/405 corridor knows, a seemingly simple 30-mile trip can easily take an hour, while a 45-mile drive can sometimes extend to two hours or more.

In contrast, the vast majority of the schools in the Marmonte League are within 20 miles of Oaks Christian, and all are within a 30-minute drive.   Even in the Tri-County Athletic Association, more than half of Oaks Christian's rivals are within 30 miles.

The net effect of moving Oaks Christian to the Parochial Area thus is that our students will be subject to lengthier travel times, which will force them to leave school earlier, significantly reducing their classroom time.   They will also have less time *after* their athletic competitions to do homework and study (not to mention, eat and sleep), because of traffic issues along the 101/405 corridor.   Missing class time due to Oaks Christian's move to the Parochial Area will thus potentially harm the education of our student athletes, which may, in turn, lead to a decrease in athletic participation by our students.

2

*Parental Involvement*

Moving Oaks Christian into the Parochial Area will adversely affect parental involvement in student athletics, as well. More than 90% of Oaks Christian's high school students live west of Topanga Canyon, including some as far west as Santa Barbara, but almost all of the Parochial Area schools are east of it. Moving Oaks Christian to the Parochial Area thus would mean that Oaks Christian's high school athletic opponents are far east of the geographic center of its student population. As a result, parents of Oaks Christian's students often would face lengthy drives along the 101/405 corridor—sometimes two hours each way, or longer—to watch their children compete. This undoubtedly would diminish parents' ability to attend and enjoy their children's athletic events, which we believe is an important element of the high school athletic experience.

*Transportation Costs*

A move to the Parochial Area would also have harsh financial consequences for Oaks Christian, as it would be required to shoulder an anticipated increase in transportation costs of more than 100%. Oaks Christian relies, in part, on its parents to drive the school's vans to many athletic events. Placing Oaks Christian in a Parochial Area league will increase travel times dramatically, and, therefore, decrease the ability of our students' parents to fulfill this role. As a result, we anticipate having to contract with bus companies to service our students, which could cause transportation costs to increase by $100,000 or more. We also anticipate that the longer distances, coupled with the high price of gasoline, would cause costs to soar for even those school vans that are driven by Oaks Christian parents.

The increased transportation costs associated with traveling to away games in a Parochial Area league would have a cascade effect throughout Oaks Christian including on student education. The increased transportation costs will directly affect the amount of funding available for need-based financial education, upon which many of our students depend, as well as academic materials and athletic equipment.

**Competitive Equity/Competitive History**

The balance of competitive equity also strongly weighs in favor of keeping Oaks Christian in the Northern Area, and moving all of Oaks Christian's sports to the Marmonte League. It appears to us that the decision to move Oaks Christian to the Parochial Area is based largely on Oaks Christian's performance in one sport—football—at the expense of more than 40 athletic teams and hundreds of student athletes who participate in other sports at Oaks Christian. We, however, believe that Oaks Christian's performance in football and in other sports justifies keeping Oaks Christian in the Northern Area, and, in the next re-leaguing cycle, moving all of Oaks Christian's sports to the Marmonte League.

A review of the records for the past several years indicates that Oaks Christian has *increased* the competitiveness of the Marmonte League in football, and, at worst, has not diminished the competitiveness of the league. It is initially important to note that in the three years that Oaks Christian has participated in the Marmonte League for football, it has finished first only once—a three-way tie with Westlake High School and St. Bonaventure—which is the same year that it won the CIF championship.

During that same time, however, Westlake won the Marmonte League *twice*, and the CIF championship once. (In the three-year period, Oaks Christian was 1–3 against Westlake.) Moreover, in the four years *prior* to Oaks Christian joining the Marmonte League for football, Westlake won the Marmonte league *three* times, and also won a CIF championship. To the extent that there is any competitive imbalance in the league, it thus cannot be linked to Oaks Christian and, indeed, would likely become *more* pronounced if Oaks Christian leaves the Marmonte League.

We also do not believe that Oaks Christian's performance in sports other than football justifies moving Oaks Christian to the Parochial Area, nor are we aware of any statistics which suggest that Oaks Christian's other sports would decrease the competitiveness of the Marmonte League or increase the competitiveness of any Parochial Area league.

**Enrollment**

We believe that enrollment deserves no independent consideration in determining whether to keep Oaks Christian in the Northern Area. Enrollment is merely one factor that contributes to an analysis of competitive equity, and, therefore, competitive equity—not enrollment—should be considered in determining area placements.

\* \* \* \* \* \* \* \*

On balance, we feel that the equities strongly weigh in favor of placing Oaks Christian in the Northern Area—rather than the Parochial Area—and, eventually, in the Marmonte League for all sports during the next re-leaguing cycle.

Thank you for considering our request. We look forward to discussing these issues, in more detail, in person on March 20, 2013, at Oak Christian's appeal in front of the Executive Committee.

Sincerely,

Jeffrey H. Woodcock
Headmaster, Oaks Christian School

Cc:    Jan Hethcock, Athletic Director, Oaks Christian School

4